UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL DUDGEON,

        Plaintiff,

   v.

COUNTY OF SONOMA, et al.,

        Defendants.

Case No.  19-cv-05615-JCS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 84

## I.    INTRODUCTION

This case arises out of an incident that occurred on January 23, 2019 ("the Incident"), when Sonoma County deputy sheriff Robert Woodworth responded to a 911 call placed by Daniel Dudgeon's wife, Breana.  It is undisputed that Deputy Woodworth entered Mr. Dudgeon's home and that in the course of the encounter Deputy Woodworth struck Mr. Dudgeon in the head.  In this action, Mr. Dudgeon asserts an excessive force claim under 42 U.S.C. § 1983 and the Fourth Amendment against Deputy Woodworth (Claim One) and a *Monell* claim against the County of Sonoma based on inadequate training with respect to use of force (Claim Two).  Mr. Dudgeon also asserts claims against Deputy Woodworth and the County of Sonoma for false arrest (Claim Three), violation of Cal. Civ. Code section 52.1 ("the Bane Act") (Claim Four), battery (Claim Five), assault (Claim Six), and negligence (Claim Seven). Plaintiff seeks monetary damages, including punitive damages, and attorneys' fees and costs incurred in this action.

Presently before the Court is Defendants' Motion for Summary Judgement [sic] and/or Partial Summary Judgement [sic] ("Motion").   A hearing on the Motion was held on October 22,

2021.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.     BACKGROUND

### A.     Factual Background

Unless otherwise stated, the facts set forth below are undisputed.  The Court summarizes here only the facts that are pertinent to resolution of the Motion.

On January 23, 2019, at approximately 3:38 a.m., Plaintiff's wife, Breana Dudgeon, called 911.  Declaration of Michael Seville In Opposition to Defendants Motion for Summary Judgement [sic]; or for Partial Summary Judgement [sic] ("Seville Decl."), Exs. C & F (911 audio recording by Sheriff's Dispatch); Further Declaration of Michael King in Support of Defendants' Motion for Summary Judgment ("King Reply Decl."), Ex. P (Redcom dispatcher portion of 911 call).  Ms. Dudgeon initially spoke to Sonoma County Sheriff dispatcher Sean McKeon. Declaration of Michael King in Support of Defendants' Motion for Summary Judgment ("King Decl."), Exs. N (CAD log of 911 call), M (McKeon Dep.) at 24.  She told McKeon that her husband was acting "super irregular" and suggested he might be having a stroke   Seville Decl., Ex. C.  McKeon then transferred Ms. Dudgeon to a medical dispatcher ("the Redcom dispatcher").  *Id.*

Ms. Dudgeon told the Redcom dispatcher that her husband was acting "irregular," that he had been "detoxing on his own for a couple days" and that he had consumed "an entire bottle of vodka" the night before. King Reply Decl., Ex. P.  She said he was acting "super crazy" and again suggested he might be having a stroke.  *Id.*  She said, "he's not acting violently" but she and her kids were "kind of scared" and so they were locked in the bedroom.  *Id.*  She then said, "and now he's banging the door in."  *Id.*  A few seconds later the dispatcher asked what Mr. Dudgeon was doing and she stated, he's just wandering around and he just broke into my master bedroom by smashing the door in."  *Id.*  At this point in the recording, the dispatcher placed Ms. Dudgeon on hold.  *Id.*

In a separate recording, the Redcom dispatcher can be heard contacting the Sonoma County Sheriff dispatcher, Sean McKeon, while Ms. Dudgeon is on hold.  Seville Decl., Ex. F.

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

The Redcom dispatcher told McKeon that "the husband's been drinking and now he just smashed the master bedroom door in." *Id.* McKeon told the Redcom dispatcher to transfer Ms. Dudgeon over and then he had a second conversation with her. *Id.*; King Decl., Ex. M (McKeon Dep.) at 24. The CAD call log for the 911 call reflects that the call was reclassified from a medical emergency to a law enforcement emergency at that point. King Decl., Ex. N (CAD 911 call log).

In the second conversation with Ms. Dudgeon, McKeon asked, "So your husband is now acting violently?" Seville Decl., Ex. F. Ms. Dudgeon responded, "he's not trying to act violently. He's just not mentally stable." *Id.* She again suggested he might be having a stroke, describing this as her "main concern." *Id.* McKeon then asked, "what did he smash the table with" and Ms. Dudgeon explained that "he didn't smash a table. He just smashed the master door." *Id.* She told McKeon that she was able to talk, that her husband was standing "right next to [her]" and spent several minutes answering McKeon's questions. *Id.* In the course of this conversation, Ms. Dudgeon told McKeon that her two children, ages 8 and 12, were in the house with her, in the master bedroom. *Id.* McKeon told Ms. Dudgeon that deputies were on the way to the house and asked Ms. Dudgeon if she "felt comfortable walking past [her] husband" to meet them at the door; she, in turn, apparently walked to the door and unlocked it and told McKeon that she had "just unlocked" the front door. *Id.* Ms. Dudgeon then told McKeon that she didn't want to leave the kids and that she was back in the bedroom. *Id.* McKeon said he would inform the deputies that the door was unlocked and that they had permission to enter the house. *Id.* McKeon ended the call when the deputies arrived. *Id.*

In response to Ms. Dudgeon's 911 call, Deputy Woodworth was dispatched to the Dudgeons' home. King Decl., Ex. B (Woodworth Decl.) ¶ 8. At oral argument, the parties stipulated that the 911 CAD log (King Decl., Ex. N) reflects what Deputy Woodworth saw on his monitor when he was dispatched to the Dudgeon's home. Deputy Woodworth also describes in his declaration what he was told by the dispatcher. In particular, he states that he was told by the dispatcher that Mr. Dudgeon was attempting to "detox" by drinking an entire bottle of vodka, that he was "acting crazy" and "was wandering around the house, smashing tables, slamming into things, and 'not acting right.'" *Id.* According to Deputy Woodworth, he was also told that Mr.

3

United States District Court
Northern District of California

1   Dudgeon had "smashed through the master door" and that there were two children in the house.

2   *Id.*; *see also* Seville Decl., Ex. K (Incident Report) (same).  Similarly, Deputy Woodworth

3   testified at his deposition that he had been told by dispatch that Ms. Dudgeon had said that Mr.

4   Dudgeon was "acting crazy," "banging around the house" and that she was "scared of him."

5   Seville Decl., Ex. H (Woodworth Dep.) at 18.  He testified further that right before his arrival he

6   was told that Mr. Dudgeon had "just broken down the door."  *Id.*

7       Deputy Woodworth activated his body camera as he approached the Dudgeon's front door

8   and the encounter between Deputy Woodworth and Mr. Dudgeon that followed is mostly captured

9   in Deputy Woodworth's body camera footage.  King Decl., Ex. C.  In the footage, Deputy

10   Woodworth can be seen ringing the doorbell and announcing himself by calling through the door,

11   "Sheriff's Office."  *Id.*  Mr. Dudgeon jogs to the door as Deputy Woodworth greets him saying

12   "hey buddy, what's going on."  Mr. Dudgeon responds by saying, "hey buddy" and telling Deputy

13   Woodworth to come in the house.  *Id.*  Mr. Dudgeon closes the door behind Deputy Woodworth

14   and says, "you're in my house now."  *Id.*  He then turns and walks towards his wife as Deputy

15   Woodworth says "sir" several times to get his attention; Mr. Dudgeon does not stop or turn around

16   to face Deputy Woodworth as the Deputy tries to get his attention.  *Id.*  As Mr. Dudgeon

17   approaches his wife, who is standing a short distance away near the bedroom door, Ms. Dudgeon

18   raises her arm in front of her, apparently motioning him away and saying, "you need to go back

19   there."  *Id.*  At this point, Deputy Woodworth takes Mr. Dudgeon by the arm saying, "lets go over

20   here."  *Id.*

21       Although Mr. Dudgeon appears to allow himself to be led away from his wife by Deputy

22   Woodworth, an instant later Deputy Woodworth can be heard calling for backup and engaging in a

23   physical struggle with Mr. Dudgeon.  *Id.*  Deputy Woodworth brings Mr. Dudgeon to the ground,

24   where he is initially facing down, and instructs Mr. Dudgeon to stop resisting and to put his hands

25   behind his back.  Instead, Mr. Dudgeon can be seen rolling onto his back and waving his hands;

26   Deputy Woodworth appears to be sitting on top of him, trying to grab Mr. Dudgeon's hands.  An

27   instant later, and within seconds of the commencement of the struggle, Mr. Dudgeon cries out in

28   pain.  *Id.*  Although it is difficult to make out in the jerky and erratic video footage, this apparently

1   was the point when Deputy Woodworth punched Mr. Dudgeon in the face.  Mr. Dudgeon then

2   rolled back onto his stomach and allowed himself to be handcuffed, still moaning in pain, with his

3   head pressed into the carpet.  *Id.*

4       In his Incident Report, Deputy Woodworth stated that Mr. Dudgeon was "displaying

5   aggressive behavior" when he arrived by "running towards [Deputy Woodworth], opening the

6   door and attempting to grab [him] while saying 'come on!'"  Seville., Ex. G (Incident Report) at 4.

7   It is not apparent from the body camera footage, however, that Mr. Dudgeon attempted to "grab"

8   Deputy Woodworth.  Deputy Woodworth also states in his Incident Report that Mr. Dudgeon

9   "attempted to grab [Ms. Dudgeon] while in the hallway."  *Id.* at 5.  However, Mr. Dudgeon cannot

10  be seen grabbing his wife in the body camera video.

11      In the Incident Report, Deputy Woodworth described his use of force as follows:

12          Fearing Daniel was about to grab, hit, or commit any crime against
            Breanna, I grabbed Daniel`s left arm in an effort to detain him in
13          handcuffs so I could safely conduct my investigation. When I grabbed
            Daniel's left arm, he immediately positioned his arm at a 90 degree
14          angle against his torso and flexed his whole arm. Based on my
            training and experience, I recognized this gesture as a way to prevent
15          law enforcement officers from handcuffing subjects. I attempted to
            position Daniel`s left arm behind his back but due to him purposely
16          tensing his arm, I was unable to.

17          To prevent any further resistance, I wrapped my right arm around the
            back of Daniel`s head and brought his head close to my chest area. I
18          then immediately applied downward pressure, forcing Daniel to the
            ground. Once on the ground, I ordered Daniel to stop resisting and put
19          his hands behind his back. Daniel instead rolled onto his back, at
            which point I got into the mounted position on top of Daniel. Daniel
20          still did not do as I asked and was attempting to grab my hands.

21          In an effort to quickly and effectively place Daniel in handcuffs and
            stop any further violence, I struck Daniel once in the face with my left
22          fist. Daniel immediately covered his face with both hands and rolled
            onto his stomach. I was then able to position both of Daniel`s hands
23          in the small of his back and place him in handcuffs, checked for fit
            and double-locked them.

24

25  Seville Decl., Ex. G (Incident Report) at 5.

26      At his deposition, Deputy Woodworth testified that just before the struggle began he

27  radioed that he was "in a fight."  Seville Decl., Ex. H (Woodworth Dep.) at 121. He testified that

28  he didn't "have the opportunity" to tell Mr. Dudgeon he was being placed under arrest and that his

United States District Court
Northern District of California

initial intent when he grabbed Mr. Dudgeon's arm was to detain him in handcuffs rather than arrest him.  *Id.* at 123, 125, 127.   When asked at his deposition whether "striking someone in the manner that [he] did to Mr. Dudgeon [ ] is . . .  something that is taught in the academy or by the department[,]" Deputy Woodworth answered "no."  *Id.*  at 135.  Deputy Woodworth testified that after he punched Mr. Dudgeon, while he was placing handcuffs on him, Deputy Woodworth placed his knee on Mr. Dudgeon's back, which is a technique he had been taught.  *Id.* at 133-134.[2] It is undisputed that there was no further use of force against Mr. Dudgeon.

After Mr. Dudgeon was in handcuffs he was removed from the house by another deputy, Deputy Minaglia, who had arrived on the scene as Deputy Woodworth was placing Mr. Dudgeon in handcuffs.  Seville Decl., Ex. H (Woodworth Dep.) at 134, Ex. G (Incident Report) at 5;  *see also* King Decl., Ex. F (Minaglia body worn camera footage).  Deputy Minaglia took Mr. Dudgeon outside, where he was seen by paramedics and then transported to the hospital for medical treatment.  Seville Decl., Ex. G (Incident Report) at 6.  Emergency Room records reflect that Mr. Dudgeon suffered a right orbital fracture and more recent medical records indicate he has experienced double vision since the incident that may be related to the fracture.  Seville Decl., Exs. I, P.  Subsequently he was taken to the County jail.  *Id.*  In the meantime, Deputy Woodworth remained in the Dudgeon's home, where he discussed what had occurred with Ms. Dudgeon and spoke briefly to the children, who were awake in the bedroom.  King Decl., Ex. C (Woodworth body camera footage).

Mr. Dudgeon testified that he has no memory of what occurred; his last memory is of drinking vodka on the evening of January 22, 2019 and his next memory is of waking up in the hospital.   King Decl., Ex. D (Dudgeon Depo.) at 14, 16.

According to Plaintiff, on May 22, 2019, the Sonoma County District Attorney's Office dismissed the charges that had been asserted against Plaintiff under Penal Code Section 148(a)(1) for resisting/obstructing a public officer.  Opposition at 13.

---

[2] In his declaration, Deputy Woodworth states that he put his knee on Mr. Dudgeon's upper back while he handcuffed him.  King Decl., Ex. B (Woodworth Decl.) ¶ 16.

**B.    Tort Claim**

The record contains a form entitled Claim Against the County of Sonoma ("Claim Form")
and a letter from Plaintiff's counsel to the Sonoma County Sheriff's Office carrying the header
"Re: California Tort Claim Act: Notice of Claim" ("Letter Notice").  King Decl., Ex. G.  The
Letter Notice is dated May 13, 2019 and states that it is a notice under California Government
Code section 905 that Plaintiff is seeking damages for injury that resulted from a "serious assault .
. . at the hands of Sonoma County Sheriff deputies while Mr. Dudgeon was in his home." *Id.*  The
Letter Notice further states that the incident occurred on January 23, 2019, "when Mr. Dudgeon
was viciously assaulted in his own home by Robert Woodworth." *Id.*  It is stamped Received on
May 20, 2019 by the "Sonoma County Sheriff's Office Administration." *Id.*

The Claim Form is dated June 5, 2019.  It states that the date of the incident was June 4,
2019, which appears to be a typographical error. *Id.*   The basis of the claim is described as
follows:  "Breana Dudgeon called 911 requesting medical attention for her husband Mr. Dudgeon.
Instead of paramedics arriving, Sonoma County Sheriff Deputy Robert Woodworth . . . responded
to the call and subsequently battered Mr. Dudgeon in his own home." *Id.*  The injury is described
as "physical injuries to [Mr. Dudgeon's] eye socket, loss of sight in his right eye, as well as mental
health injuries leading to post-traumatic stress disorder." *Id.*  The Claim Form is stamped
"Received" on June 7, 2019 by the Sonoma County Board of Supervisors. *Id.*

**C.    Internal Affairs Investigation**

It appears to be undisputed that at some point an Internal Affairs investigation of the
January 23, 2019 incident was conducted and a report was completed, though the report is not in
the record that is before the Court. *See* Seville Decl., Ex. Q (Report of Plaintiff's Use of Force
expert, Timothy T. Williams, stating that he had reviewed, *inter alia*, the "Internal Affairs Report
regarding January 23, 2019 incident involving Robert Woodworth") at 3.  Apparently, the
investigation was conducted by Sean Jones, who testified that he viewed the body worn camera
footage, read Deputy Woodworth's Incident Report and spoke to Ms. Dudgeon on the telephone
but did not interview Deputy Woodworth.  Seville Decl., Ex. K (Jones Depo.) at 22-23.  Jones
testified that based on his investigation, he concluded that Deputy Woodworth did not violate any

1    procedural policies during his encounter with Mr. Dudgeon.  *Id.* at 22.

2        **D.    IOLERO Report**

3            It appears that the Independent Office of Law Enforcement Review and Outreach

4    ("IOLERO"), a civilian oversight organization created in 2016, investigated the Incident and made

5    policy and training recommendations based on what it learned. [3] Seville Decl., Ex. L (IOLERO

6    Annual Report 2019-2020) ("IOLERO Report") at 47-48.  The IOLERO Report describes the

7    auditor's conclusion as "incomplete" and goes on to state:

8                The deputy's actions may have been appropriate based on the
             information he received, but the evidence showed that the information
9            he received was incomplete and inaccurate. Thus, the investigation
             was incomplete and should not be exonerated until the actions of
10           dispatch are investigated.

11   *Id.* at 47.  The "Auditor's Recommendations" state:

12               It was recommended that Internal Affairs review the information
             conveyed in the 911 call and compare it to the information relayed
13           over dispatch and in the event chronology to address dispatch training
             issues. In this case, the information provided to the deputy over
14           dispatch was inaccurate. The entire tenor of the information conveyed
             to the deputy illustrated a violent scene where an arrestee was being
15           forceful and violent. Yet, the information about reporting party's
             relatively calm tone, ability to move around the house and his
16           emphasis on a medical emergency were not conveyed.

17               If the deputy had been provided with complete and accurate
             information, he may have approached the situation differently. On the
18           other hand, perhaps nothing would have changed and the incident
             would have been the same. That is unknown. What is known is that
19           the information relayed by the person who called 911 was different
             than the picture painted for the deputy by dispatch. This depicted an
20

21   _____
     [3] When Plaintiff's counsel deposed the IOLERO director, Defendants invoked various privileges
22   when counsel asked her the basis for the recommendations made in this section of the report.
     Seville Decl., Ex. M (Navarro Depo.) at 32-33.  Likewise, Defendants declined to stipulate at oral
23   argument that the incident that gave rise to the recommendations and findings in this section of the
     IOLERO Report (Audit 19-C-0018) was the one that is at issue in this case.  Nonetheless, in their
24   Reply brief Defendants treated it as such, referring to the incident at issue in the IOLERO report as
     the "subject incident."  See Reply at 10 ("It is highly insightful that in the review by this civilian
25   Director of IOLERO, of the subject incident, (88-12 pp.8-9) that she did not have the Body Worn
     Camera video. She also very clearly did not have the Redcom dispatch since it is not mentioned in
26   any way. Without that information, which was relayed to the deputy before he arrived at the
     Dudgeon residence, it is possible to misunderstand that the entries in the CAD log (ECF 84-15),
27   are also made by the Redcom dispatcher.").  While the Court assumes for the purposes of the
     instant Motion that the incident described in the IOLERO Report at pages 47 and 48 is the same
28   incident that gave rise to the claims in this case, whether or not that is, in fact, the case has no
     impact on the Court's ruling on the instant motion.

inaccurate set of circumstances and it placed the deputy and community members at risk.

*Id.*  The "Sheriff's Response" to this recommendation states:  "The SCSO opened an investigation of the practices, training and procedures of dispatch based on patterns detected in this case and another audit (See: 19-IA-0007)."[4]  *Id.*

The IOLERO Report goes on to note that initially the Sonoma County Sheriff's Office provided body worn camera footage of only the deputy involved in the use of force but that in response to IOLERO's second request, footage from four body cameras was supplied.  *Id.* at 48. A recommendation was made for the Sonoma County Sheriff's Office to provide all body worn camera footage but the IOLERO report also found that the failure to do so initially was not intentional and observed that the footage that was initially supplied was "of the main officer who responded to the incident."  *Id.*

### E.   The Motion

In the Motion, Defendants seek summary judgment on all of Plaintiff's claims.  With respect to the Fourth Amendment excessive force claim against Deputy Woodworth, Defendants contend the undisputed facts establish that the force used by Deputy Woodworth was objectively reasonable.  Even if there are material disputes of fact as to whether excessive force was used against Plaintiff, Defendants assert, Deputy Woodworth is entitled to qualified immunity because he did not violate a clearly established right.  Defendants further assert that the *Monell* claim asserted against the County of Sonoma based on the alleged Fourth Amendment violation fails as a matter of law because there are no facts showing that the use of force was caused by any unconstitutional custom, practice or procedure or inadequate training by the County of Sonoma.

Defendants contend the false arrest claim fails as to both defendants because the

---

[4] Audit 19-IA-0007 is discussed earlier in the Report but it appears that the excerpt provided by Plaintiff in connection with his Opposition does not contain the entire discussion of that audit.  *See id.* at 39 (reflecting that this audit involved a complaint by David Ward that was sustained).  The excerpt provided indicates IOLERO recommended that Internal Affairs investigators be trained to avoid using leading questions when conducting interviews.  *Id.*  The "Sheriff's Response" included the following:  "**Train on the importance of conveying accurate information on BOL's and over dispatch:**  The SCSO will open a new investigation to examine the issues that arose in this case and another case (see 19-C-0018)."  *Id.*

United States District Court
Northern District of California

undisputed facts establish that there was probable cause for the arrest.  In particular, they argue that it is obvious from Deputy Woodworth's body camera footage that Mr. Dudgeon was resisting arrest.  Defendants argue that as to the County of Sonoma, the claim fails for the further reason that Plaintiff's tort claim under Cal. Gov't Code section 910 did not include any facts that would have put the County of Sonoma on notice that Mr. Dudgeon was claiming anything more than excessive force.

Defendants argue that the Bane Act claim under California Civil Code §52.1 is barred because the force used by Defendant was objectively reasonable and there is no evidence of a specific intent to violate any constitutional right of Plaintiff.

Defendants argue that they are entitled to summary judgment on the assault and battery claims because under California Penal Code §835a an arresting or detaining police officer may "use reasonable force to effect the arrest, to prevent escape or to overcome resistance."  Therefore, for the same reason the Fourth Amendment excessive force claim fails the assault and battery claims also fail, Defendants assert.  Similarly, they argue that they are entitled to summary judgment on the negligence claim because the Fourth Amendment reasonableness standard applies to claims that officers were negligent in using excessive force.

Finally, Defendants argue that the undisputed facts establish that Plaintiff is not entitled to punitive damages under either federal or state law. Defendants further contend punitive damages against the County of Sonoma are barred under Cal. Gov't. Code section 818.

Defendants also request judicial notice of certain documents and records filed in support of the Motion.  Dkt. 85.

## III.   ANALYSIS

### A.   Legal Standards Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

United States District Court
Northern District of California

persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B.    The Request for Judicial Notice

Defendants ask the Court to take judicial notice of Exhibits A-N to the King Declaration, which consist of the following: 1) Plaintiff's Third Amended Complaint; 2) Deputy Woodworth's declaration; 3) Deputy Woodworth's complete bodycam footage of the encounter; 4) Declaration of Lt. Sean Jones; 5) Sonoma County Sheriff's Office Use of Force policy in effect in January 2019; 6) complete body worn camera footage of Deputy Minaglia; 7) tort claim and notice filed

1    with the County of Sonoma by Mr. Dudgeon; 8) medical records from two doctors who examined

2    Mr. Dudgeon; 9) deposition excerpts of Breana Dudgeon, Daniel Dudgeon, Robert Woodworth

3    and Sean McKeon; and 10) the CAD log of the 911 call.  Dkt. No. 85.  Defendants contend these

4    exhibits are subject to judicial notice under Rule 201 of the Federal Rules of Evidence because the

5    tort claim is a public record and all of "[t]he exhibits 'can be accurately and readily determined

6    from sources whose accuracy cannot reasonably be questioned.' " *Id.*, (quoting Fed. R. Evid.

7    201(b)(2)).  In particular, Defendants state, "The exhibits were either produced by one of the

8    parties in discovery, are medical records obtained under authorization or subpoena, are portions of

9    depositions taken by a certified shorthand reporter; and/or are business records of the Sheriff's

10   Office maintained in the ordinary course of business."  *Id.*

11          The court may take notice of the date of filing and content of the tort claim filed with the

12   County of Sonoma (though not the truth of any statement contained therein) because it is a

13   document of public record and the content of the claim is "capable of accurate and ready

14   determination by resort to sources whose accuracy cannot be reasonably questioned."  *Clarke v.*

15   *Upton*, 703 F. Supp. 2d 1037, 1042 (E.D. Cal. 2010).  Therefore, the Court GRANTS the request

16   for judicial notice of King Decl., Ex. G.

17          The Court DENIES the request as to the remaining documents.  As to the Third Amended

18   Complaint, the Court may consider pleadings in this case without taking judicial notice of them

19   and therefore it is unnecessary to take judicial notice of that exhibit.  Defendants have cited no

20   authority that Deputy Woodworth's declaration, which contains his account of what occurred and

21   thus facts that are disputed, is properly subject to judicial notice under Rule 201.  Similarly, the

22   declaration of Lt. Sean Jones contains an account of his review of the body worn camera footage

23   and conclusions that the use of force by Deputy Woodworth was consistent with the use of force

24   policy in effect at the time.  It is unclear what fact Defendants are asking the Court to take judicial

25   notice of and they have cited no authority suggesting that its appropriate to do so.   Similarly, it is

26   unclear what Defendants are asking the Court to take judicial notice of with respect to the body

27   worn camera footage of Deputies Woodworth and Minaglia or why it necessary to take judicial

28   notice of this evidence given that there is no dispute as to its authenticity and Rule 56(c) allows

the Court to consider such evidence.  Nor have Defendants explained their request for judicial notice of the deposition excerpts, medical records, or CAD 911 log upon which they rely.

### C.   The Excessive Force Claim

#### 1.   Legal Standards Governing Excessive Force Claims under 42 U.S.C. § 1983 and the Fourth Amendment

Section 1983 provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted)).  Thus, analysis of a civil rights claim brought under § 1983 begins with the identification of the "specific constitutional right allegedly infringed by the challenged application of force."  *Id*. at 394 (citation omitted).  The claim is then evaluated under the constitutional standards that apply to that constitutional right.  *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)).

Mr. Dudgeon asserts that Defendants' use of excessive force resulted in an unreasonable seizure under the Fourth Amendment. This claim is analyzed under the Fourth Amendment's "objective reasonableness" standard.  *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 921 (9th Cir. 2001).  In particular, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397.  "This inquiry 'requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake.'" *Glenn v. Washington Cty*., 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985))).  Thus, courts first consider the quantum of force used and then balance that against the government's interest in the use of force. *Id*. at 876.

"The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id*. at 872 (quoting *Graham*, 490 U.S. at 396).  Of these factors, the Ninth Circuit has held that the most important is "whether the suspect poses an immediate threat to the safety of the officers or others."  *Chew v. Gates*, 27 F.3d 1432, 1441 (9th

Cir. 1994).  Determining whether the force used was reasonable "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S.  at 396.  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d at 701 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

### 2. Whether Deputy Woodworth is Entitled to Summary Judgment on the Excessive Force Claim

As a preliminary matter, the Court addresses the quantum of force used against Mr. Dudgeon.   While Deputy Woodworth punched Mr. Dudgeon only once, it is undisputed that the punch required that Mr. Dudgeon be taken to the hospital for emergency medical treatment and that he suffered at least an orbital fracture to his right eye socket as a result of the punch.  There is also evidence that the punch may have caused long-term vision impairment.  Drawing all reasonable inferences in Mr. Dudgeon's favor, the Court finds that Deputy Woodworth's blow was " 'capable of inflicting significant pain and causing serious injury,' and as such '[is] regarded as "intermediate force" ' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests.' " *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (quoting *Young v. County of L.A.*, 655 F.3d 1156, 1161–62 (9th Cir. 2011)).   In this context, the Court addresses the factors set forth in *Graham* and its progeny to determine whether Defendants are entitled to summary judgment on the basis that the force used against Mr. Dudgeon was reasonable.

First, the Court addresses the most significant *Graham* factor, whether Mr. Dudgeon posed

1   an immediate threat to Deputy Woodworth or to others.  Defendants contend Deputy

2   Woodworth's body worn camera footage establishes as a matter of law that "there was an obvious

3   and immediate threat" to Ms. Dudgeon when he approached her after Deputy Woodworth entered

4   the house, and that later there was a threat to Deputy Woodworth himself when Mr. Dudgeon

5   tensed as Deputy Woodworth held his arm.  Motion at 18.  There is no doubt that a jury, upon

6   viewing the Woodworth body worn camera footage, might conclude that Deputy Woodworth

7   reasonably believed Mr. Dudgeon posed a threat to either his wife or Deputy Woodworth.  The

8   footage is not sufficient, however, to establish that that was the case as a matter of law.

9          In particular, Defendants contend it is obvious that Mr. Dudgeon was acting aggressively

10  when he invited Deputy Woodworth into the house and closed the door behind him, but Ms.

11  Dudgeon thought her husband was "trying to be buddy buddy" and the footage does not

12  necessarily contradict her interpretation of the situation.  King Decl., Ex. C (Woodworth bodycam

13  footage) at 8:04.  The footage of Mr. Dudgeon approaching his wife also does not clearly establish

14  that he was acting in a threatening manner or trying to grab her.  Nor is it obvious from Ms.

15  Dudgeon's demeanor and tone of voice as her husband approached her that Deputy Woodworth

16  reasonably believed that there was an imminent threat to Ms. Dudgeon.  Drawing all reasonable

17  inferences in Plaintiff's favor, a jury could conclude based on the bodycam footage of Deputy

18  Woodworth that Mr. Dudgeon did not pose an imminent threat to either Ms. Dudgeon or Deputy

19  Woodward.   The bodycam footage is also unenlightening with respect to whether Mr. Dudgeon

20  tensed up when Deputy Woodworth pulled him away from his wife, which is what Deputy

21  Woodworth said initially led him to conclude Mr. Dudgeon was resisting arrest.

22         Because the Court concludes there are fact questions about whether excessive force was

23  used against Mr. Dudgeon the Court rejects Defendants' request for summary judgment on the

24  basis that the force used against Mr. Dudgeon was reasonable as a matter of law.

25              **3.  Whether Deputy Woodworth is Entitled to Qualified Immunity**

26         "The doctrine of qualified immunity protects government officials 'from liability for civil

27  damages insofar as their conduct does not violate clearly established statutory or constitutional

28  rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231

(2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity provides government officials with "immunity from suit rather than a mere defense to liability."  *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted)).  The rule attempts to balance competing interests – those of plaintiffs who have been wronged by government officials, and those of government officials who may be inhibited in performance of their duties out of fear of financial liability and time-consuming litigation.  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

To determine if an official is protected by qualified immunity, a court asks (1) whether the plaintiff's constitutional right has been violated; and (2) whether that right was clearly established at the time of the challenged conduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In *Saucier*, the Supreme Court held that the qualified immunity analysis required that the district court first determine whether there was a violation of the plaintiff's constitutional rights and that only if such a violation was found should it proceed to the question of whether the violation involved a clearly established right.   533 U.S. at 201.  In *Pearson*, however, the Court modified this rule, holding that the qualified immunity analysis need not be done in any particular order.  555 U.S. at 236.  The Court reasoned that while the approach required under *Saucier*'s mandate may have a beneficial effect on the development of precedent, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  *Id*. at 237.   Therefore, the Court concluded, a more flexible approach is warranted and will permit the lower courts to "determine the order of decision making that will best facilitate the fair and efficient disposition of each case."  *Id*. at 242.

The inquiry as to whether a constitutional right is clearly established is "particularized." *Saucier*, 533 U.S. at 201.  It is not enough that the general rule is established.  *Id*.  Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S.  635, 640 (1987)).   Here, there are disputed facts as to whether the amount of force Deputy Woodworth used against Mr. Dudgeon was reasonable.  It is undisputed, however, that Deputy Woodworth arrived at the Dudgeon's home believing there was a potential domestic dispute in progress.

16

Moreover, the body camera footage clearly shows that Mr. Dudgeon failed to respond to Deputy Woodworth's repeated attempts to get his attention as he walked towards his wife and away from the deputy.  Finally, there can be no dispute that when Deputy Woodworth instructed Mr. Dudgeon to put his hands behind his back, Mr. Dudgeon failed to cooperate, instead rolling onto his back and waving his hands in the air.

Defined at an appropriate level of specificity, the question the Court must address is whether an officer violates clearly established law when he enters a potential domestic dispute situation, performs a take-down maneuver on an individual who is approaching his wife and children and may pose a threat to them, and then strikes the individual once when the individual fails to cooperate with the officer's attempt to detain him.   The Court concludes that he does not. Plaintiff has not cited to any case involving similar facts where a Fourth Amendment violation was found.  On the other hand, in *Shafer v. Cty. of Santa Barbara*, the Ninth Circuit found that under somewhat similar circumstances an officer was entitled to qualified immunity when he "progressively increase[d] his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuse[d] to comply with the officer's orders and resist[ed], obstruct[ed], or delay[ed] the officer in his lawful performance of duties such that the officer ha[d] probable cause to arrest him in a challenging environment."  868 F.3d 1110, 1117 (9th Cir. 2017).

In *Shafer*, the plaintiff had refused to drop water balloon he was holding in response to the officer's commands.  868 F.3d at 1113.  The officer pulled the plaintiff by the arms, causing him to lose his footing, and then kicked his legs out from under him, causing the plaintiff to "fall face first onto the pavement."  868 F.3d at 1113.  The officers then piled on top of plaintiff and he felt a knee in his back and a boot on his head, pushing his face into the pavement.  *Id*.  A jury found that the officer had violated the plaintiff's Fourth Amendment right to be free from excessive force and on appeal, the Ninth Circuit found that there was sufficient evidence to support the verdict. Nonetheless, it concluded that the officer was entitled to qualified immunity because the officer's conduct did not violate any clearly established law.  *Id.*  at 1117.   Similarly, the body worn camera footage shows that the force used against Mr. Dudgeon was in response to Mr. Dudgeon's

17

failure to respond to Deputy Woodworth and then his lack of cooperation when Deputy

Woodworth tried to detain him, all in a "challenging environment" where Deputy Woodworth had

some reason to believe Mr. Dudgeon might pose a threat to his wife and children.  Therefore, the

Court concludes that Deputy Woodworth's use of force did not violate clearly established law and

that Deputy Woodworth is entitled to qualified immunity.

### 4.   Whether the County of Sonoma is Entitled to Summary Judgment on the *Monell* Claim

Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by

its employees on a theory of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,

691 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

inflicts the injury that the government as an entity is responsible under § 1983."  *Id*. at 694.

"[W]here a municipality's failure to train its employees in a relevant respect evidences a

'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly

thought of as a city 'policy or custom' that is actionable under § 1983."  *City of Canton, Ohio v.*

*Harris*, 489 U.S. 378, 389 (1989).  "To impose liability on a local governmental entity for failing

to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he

possessed a constitutional right of which he was deprived; (2) that the municipality had a policy;

(3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and

(4) that the policy is the 'moving force behind the constitutional violation.' "  *Oviatt By & Through*

*Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton*, 489 U.S. at 389–

91).

In his Third Amended Complaint, which is the operative complaint, Plaintiff asserts his

*Monell* claim based on allegations that the County of Sonoma provided inadequate training in the

use of de-escalation techniques and that its policy instructing deputies to make an initial

assessment of the situation independent of the information provided by the dispatcher – here, Ms.

Dudgeon's insistence that she was not in danger and that she was seeking medical assistance for

her husband – led to the use of excessive force against Mr. Dudgeon.  Third Amended Complaint

¶¶ 61-75.  In his Opposition brief, however, Plaintiff contends there are material disputes of fact on the *Monell* claim based on somewhat different theories.  In particular, he points to: 1) failure to train based on Deputy Woodworth's testimony that he was not trained to use a close-fisted punch as a compliance method; 2)  lack of training regarding the transmission of accurate information by dispatch to deputies; and 3) "an atmosphere of invincibility and lack of accountability" based on knowledge that Internal Affairs conducts investigations only when there is a formal complaint, does a "substandard job" when it conducts such investigations and "disrupts" IOLERO audits. For the reasons set forth below, the Court finds that Plaintiff has not established that there is a material dispute of fact under any of these theories.

In support of the first theory, Plaintiff points to Deputy Woodworth's deposition testimony that "striking someone in the manner that [he] did to Mr. Dudgeon [ ] [was] . . .  something that [was not] taught in the academy or by the department[.]" Seville Decl., Ex. H (Woodworth Depo.) at 135.  Plaintiff's use of force expert, Timothy Williams, also opines that Deputy Woodworth's use of force was inconsistent with the official use of force policy of the Sonoma County Sheriff's Department because he did not attempt to deescalate before using force and because the punch to the face caused serious injury and was not standard procedure.  Seville Decl., Ex. Q (Williams Report) at 4 (citing Sonoma County Sheriff Office Use of Force Policy);  *see also*  King Decl., Ex. E (Use of Force Policy).  But " '[m]ere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability' under *Monell* for inadequate training." *Vasquez v. City of Santa Paula*, No. 13CV07726CBMAJWX, 2015 WL 12734071, at *3 (C.D. Cal. Mar. 11, 2015) (quoting *Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989);  and citing *Alexander v. Cnty of San Francisco*, 29 F.3d 1355. 1367-68 (9th Cir. 1994.); *City of Canton v. Harris*, 489 U.S. 378, 379, 392 (1989)).  Assuming that the evidence establishes that Deputy Woodworth failed to follow the official policy of the Sonoma County Sheriff's Office with respect to de-escalation or the type of force that he used to obtain compliance from Mr. Dudgeon, it is not enough to establish *Monell* liability as to the County of Sonoma because Plaintiff has not offered evidence of other similar incidents.  Nor has he offered any evidence whatsoever as to how deputies are trained with respect to de-escalation or the use of a blow to the face (or any other part of the body) to obtain

United States District Court
Northern District of California

1   compliance.  Therefore, Defendants are entitled to summary judgment to the extent Plaintiff's

2   *Monell* claim is based on the theory that the Sonoma County Sheriff's Office does not adequately

3   train its deputies in these respects.

4         The Court further finds that Plaintiff has not offered evidence that gives rise to a material

5   dispute of fact with respect to the alleged culture of invincibility at the Sonoma County Sheriff's

6   Office.  First, the only evidence in the record that supports Mr. Dudgeon's contention that Internal

7   Affairs only investigates uses of force when a formal complaint is lodged is the evidence relating

8   to his own case.  *See* King Decl., Ex. D (Jones Decl.) ¶ 3 (stating that Jones was assigned to

9   investigate the use of force against Mr. Dudgeon in July 2019 after a claim was filed based on the

10  Incident).  This single example does not establish a policy or practices for the reasons stated

11  above.  Similarly, even assuming the failure to interview Deputy Woodworth is an indication that

12  the investigation was "substandard," it is only one example and is not sufficient to establish

13  *Monell* liability.

14        Nor is Plaintiff's contention that Sonoma County Sheriff's Office interferes with audits of

15  use of force by IOLERO supported by evidence sufficient to establish a fact question precluding

16  summary judgment on Plaintiff's *Monell* claim.  Plaintiff points to a statement in the IOLERO

17  Report that it maintains "a professional and collaborative relationship with the Sheriff's Office"

18  and avoids "unnecessary confrontation" that can result in " 'lock-outs' by the sheriff's system" but

19  the Report does *not* state that such a lock-out has ever occurred in connection with the Sonoma

20  County Sheriff's Office.  Seville Decl., Ex. L (IOLERO Report) at 5.  Rather, the Report states

21  that such lock-outs have occurred in Sacramento and Los Angeles; in contrast, in Sonoma County

22  "the threat of a lock-out has not been an issue."  *Id.*

23        Likewise, Plaintiff's reliance on recommendations related to the failure of the Sheriff's

24  Office to provide the body camera footage of all of the deputies who came to the scene of the

25  incident discussed in the IOLERO Report in response to IOLERO's first request is misplaced as

26  IOLERO made clear that it found no reason to believe the omission was intentional and also

27  emphasized that the body camera footage that was initially provided was that of the "first and

28  main officer who responded to the incident."  *Id.* at 47-48.  Furthermore, the body camera footage

United States District Court
Northern District of California

1   of the remaining deputies was provided in response to IOLERO's second request.  *Id.*  In sum,

2   there is nothing in the IOLERO Report to suggest that the initial failure to provide the body

3   camera footage of all of the deputies who came to the scene had any impact on IOLERO's ability

4   to conduct the audit, much less that this conduct contributed to or reflected a culture of

5   invincibility.

6         Plaintiff also relies on the fact that "prior to the passage of an ordinance expanding

7   the investigatory powers of the IOLERO, the oversight agency could not conduct its own

8   interviews with witnesses or alleged victims."  Opposition at 16 (citing Seville Decl., Ex. M

9   (Navarro Depo.) at 27: 8-15). He offers no evidence, however, that this limitation contributed to a

10  culture of invincibility or that it tainted the audit of his own complaint.

11        Similarly, Plaintiff's reliance on a statement in the IOLERO Report about the use of

12  leading questions by Internal Affairs investigators is misplaced.  Opposition at 16.  The Report

13  states in connection with the Ward audit that "[o]ne of the recurring themes in the SCSO's

14  [Internal Affairs] interviews is that the interview style of the [Internal Affairs] investigators is to

15  ask leading questions. . . . [which] can give the impression that the SCSO wants a particular

16  answer or is trying to help or hinder the interviewee."  Seville Decl., Ex. L (IOLERO Report) at

17  39.  The Report does not state, however, that the use of leading questions in the Ward case tainted

18  the Internal Affairs investigation of that case.  Indeed, the Report reflects that that complaint was

19  sustained as a result of the Internal Affairs investigation, contradicting Plaintiff's assertion that

20  this practice created a culture of invincibility.  Nor is there any evidence that leading questions

21  tainted the Internal Affairs investigation of Mr. Dudgeon's case.   Therefore, the Court concludes

22  this evidence is not sufficient to establish a fact question on Plaintiff's *Monell* claim based on a

23  culture of invincibility.

24        The Court also finds that Plaintiff has not established a material dispute of fact based on

25  inadequate training of dispatchers.   There is no doubt that there is evidence in the record that in

26  the case of the Incident that is the basis of Mr. Dudgeon's *Monell* claim, the dispatcher may have

27  conveyed incorrect information to Deputy Woodworth that suggested that Mr. Dudgeon was

28  acting violently despite Ms. Dudgeon's repeated statements to the dispatcher that he was not.  *See*

King Decl., Exs. N (CAD log of 911 call stating that "HUSBAND JUST SMASHED A TABLE"), B (Woodworth Decl.) at ¶ 8 (stating that dispatch had informed Deputy Woodworth that Mr. Dudgeon was "wandering around the house smashing tables"); Seville Decl. Exs. C, F (911 audio recording); King Reply Decl., Ex. P (911 audio recording – Redcom dispatcher).  Drawing all reasonable inferences in Plaintiff's favor, a jury could reasonably conclude that the dispatcher's failure to accurately convey to Deputy Woodworth important information provided by Ms. Dudgeon led Deputy Woodworth to believe the threat Mr. Dudgeon posed was greater than it actually was, thus contributing to the use of more force than was necessary under the circumstances.  *See* Seville Decl., Ex. L (IOLERO Report) at 47 (noting that "the information relayed by the person who called 911 was different than the picture painted for the deputy by dispatch" and finding that this "depicted an inaccurate set of circumstances and it placed the deputy and community members at risk.").

    As discussed above, however, a *Monell* claim based on inadequate training cannot be established based only on evidence relating to a single incident.  Plaintiff suggests that there was at least one other similar incident but the evidence of that is not sufficient to establish a material dispute of fact.  In particular, Plaintiff points the statement in the IOLERO Report that the Sonoma County Sheriff's Office "opened an investigation of the practices, training and procedures of dispatch based on patterns detected in this case *and another audit*."  Opposition at 15 (citing Seville Decl., Ex. L (IOLERO Report) at 47 (emphasis added) (referring to Audit 19-IA-0070 ("Ward audit"))).  The excerpt of the IOLERO Report discussing the Ward audit, however, provides no details about what information provided by the dispatcher in that case was inaccurate or what impact this may have had on the events in that case.  Furthermore, when Plaintiff's counsel asked the IOLERO director at her deposition to explain the basis for the recommendation "regarding dispatch[,]" Defendants' counsel invoked various privileges and so no further information was provided.  Seville Decl., Ex. M (Navarro Depo.) at 32.

    Accordingly, the Court finds that Plaintiff has failed to establish a material dispute of fact as to his *Monell* claim.

United States District Court
Northern District of California

1

**D.      False Arrest Claim**

2         To prevail on a claim for false arrest, a plaintiff must establish the following elements: the

3    defendant arrested the plaintiff without a warrant, the plaintiff was harmed, and the defendant's

4    conduct was a substantial factor in causing the harm.  *See Carcamo v. Los Angeles Cty. Sheriff's*

5    *Dep't*, 68 Cal. App. 5th 608 (2021), reh'g denied (Sept. 30, 2021) (citing *City of Newport Beach v.*

6    *Sasse*, 9 Cal.App.3d 803, 810 (1970); CACI No. 1401.  If a plaintiff proves these elements, the

7    defendant has the burden of persuasion to prove the arrest was justified.  *Id.* (citing *Gillan v. City*

8    *of San Marino*, 147 Cal. App. 4th 1033, 1044 (2007)).   An arrest is justified if the defendant had

9    reasonable or probable cause to believe that the plaintiff committed a crime in his presence.  *Id.*

10   (citing *Gillan*, 147 Cal. App. 4th at 1044; CACI No. 1402.).

11        Defendants contend it is obvious from Deputy Woodworth's body camera footage that Mr.

12   Dudgeon was committing a crime in Deputy Woodworth's presence by resisting arrest,

13   establishing as a matter of law that the arrest was justified and therefore that they are entitled to

14   summary judgment on this claim.  The Court agrees.  As discussed above, the body camera

15   footage shows that after Deputy Woodworth instructed Plaintiff to put his hands behind his back

16   he instead rolled on his back and waved his hands in the air, preventing Deputy Woodworth from

17   placing Mr. Dudgeon in handcuffs.  Therefore, this claim fails as a matter of law.

18        The Court further concludes that this claim is barred as to the County of Sonoma and

19   Deputy Woodworth because Plaintiff failed to satisfy the claim requirement under California

20   Government Code section 910.  As a preliminary matter, the Court notes that Plaintiff has

21   apparently conceded that his tort claim does not adequately present his false arrest claim as he did

22   not respond to this argument in his Opposition brief.   In any event, the claim Plaintiff presented to

23   the County of Sonoma does not comply with section 910 for the purposes of his false arrest claim

24   for the reasons set forth below.

25        Under the California Tort Claims Act ("CTCA"), there are "certain conditions precedent to

26   the filing of a lawsuit against a public entity[,]" including filing a claim for money or damages

27   with the public entity.  *State of California v. Superior Court* ("*Bodde*"), 32 Cal.4th 1234, 1237

28   (2004) (citing Cal. Gov't. Code § 911.2).  Failure to comply with this requirement bars a plaintiff

United States District Court
Northern District of California

23

from bringing suit against the entity. *Id.* (citing Cal. Gov't Code § 945.4). Further, "under

California Government Code § 950.2, any suit against a public employee is barred in cases where

a plaintiff's action against the agency is barred for failure to present a claim." *McConnell v.*

*Lassen County*, No. CIV. S–05–0909 FCD DAD, 2007 U.S. Dist. LEXIS 47373, at *44–45, 2007

WL 1931603 (E.D. Cal. June 29, 2007).

Cal. Gov't Code section 910 explains what information must be provided in a claim,

providing as follows:

> A claim shall be presented by the claimant or by a person acting on
> his or her behalf and shall show all of the following:
>
> (a) The name and post office address of the claimant.
>
> (b) The post office address to which the person presenting the claim
> desires notices to be sent.
>
> (c) The date, place and other circumstances of the occurrence or
> transaction which gave rise to the claim asserted.
>
> (d) A general description of the indebtedness, obligation, injury,
> damage or loss incurred so far as it may be known at the time of
> presentation of the claim.
>
> (e) The name or names of the public employee or employees causing
> the injury, damage, or loss, if known.
>
> (f) The amount claimed if it totals less than ten thousand dollars
> ($10,000) as of the date of presentation of the claim, including the
> estimated amount of any prospective injury, damage, or loss,
> insofar as it may be known at the time of the presentation of the
> claim, together with the basis of computation of the amount
> claimed. If the amount claimed exceeds ten thousand dollars
> ($10,000), no dollar amount shall be included in the claim.
> However, it shall indicate whether the claim would be a limited
> civil case.

Cal. Gov't Code § 910.

California case law makes clear that a claim need not strictly comply with section 910 in

order to be considered a claim. *See Bodde*, 32 Cal.4th at 1245 (noting that "a plaintiff need not

allege strict compliance with the statutory claim presentation requirement"). Rather, substantial

compliance is sufficient. *See Dilts v. Cantua Elem. Sch. Dist.*, 189 Cal.App.3d 27, 33, 234 (1987)

("[C]ourts employ the test of substantial compliance rather than strict compliance in deciding

whether a plaintiff has met the requirements of the Tort Claims Act."). "Substantial compliance,

24

1   however, requires substantial compliance with each of the elements in § 910." *Santos v. Merritt*

2   *Coll.*, No. C-07-5227 EMC, 2008 WL 4570708, at *3 (N.D. Cal. Oct. 14, 2008) (citing *City of San*

3   *Jose v. Superior Court*, 12 Cal.3d 447, 456–57 (1974) (stating that, "to gauge the sufficiency of a

4   particular claim, two tests shall be applied: Is there some compliance with all of the statutory

5   requirements; and, if so, is this compliance sufficient to constitute substantial compliance?");

6   *Connelly v. County of Fresno*, 146 Cal.App.4th 29, 38(2006) (stating that, "[w]here a claimant has

7   attempted to comply with the claim requirements but the claim is deficient in some way, the

8   doctrine of substantial compliance may validate the claim 'if it substantially complies with all of

9   the statutory requirements . . . even though it is technically deficient in one or more particulars.'

10  "); *Del Real v. City of Riverside*, 95 Cal.App.4th 761, 769 (2002) (stating that "[s]ubstantial

11  compliance contemplates that there is at least some compliance with all of the statutory

12  requirements")).

13         The test of substantial compliance is "whether sufficient information is disclosed on the

14  face of the filed claim 'to reasonably enable the public entity to make an adequate investigation of

15  the merits of the claim and to settle it without the expense of a lawsuit.' " *White v. Moreno Valley*

16  *Unified Sch. Dist.*, 181 Cal. App. 3d 1024, 1031 (1986) (quoting *City of San Jose v. Superior*

17  *Court*, 12 Cal.3d at 456). "Stated another way, the claimant's judicial pleadings are limited to

18  bases for recovery 'fairly reflected in the written claim.' " *Id.* (quoting *State of California ex rel.*

19  *Dept of Transportation v. Superior Court*, 159 Cal.App.3d at 336).

20         Here, the description of the facts and Plaintiff's injury in the Claim Form and Letter Notice

21  (quoted above) is limited to Deputy Woodworth's use of force against Mr. Dudgeon in his home

22  and the physical and emotional injury he sustained as a result.  King Decl., Ex. G. There is no

23  suggestion in the claim that he was seeking to recover based on injury caused by a false arrest.

24  Therefore, the Court concludes that the tort claim Plaintiff made under the CTCA does not

25  substantially comply with section 910 with respect to the false arrest claim he seeks to assert in

26  this action, which is therefore barred as to both defendants.

27         **E.      Assault and Battery Claims**

28         The torts of assault and battery under California law are governed by the same

United States District Court
Northern District of California

reasonableness standards as claims for excessive force asserted under 42 U.S.C. § 1983 and the Fourth Amendment. *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1179 (E.D. Cal. 2008), aff'd, 340 F. App'x 377 (9th Cir. 2009). Because the same standards apply to these claims as the Section 1983 excessive force claim, the Court concludes that there are material disputes of fact that preclude summary judgment on the assault and battery claim for the reasons discussed above.

### F.    Negligence Claim

The elements of a cause of action for negligence are 1) a breach of 2) a legal duty to use due care that 3) is the proximate or legal cause of resulting injury. *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996). To prevail on a claim for negligence, "Plaintiffs must show that the Defendant officers acted unreasonably and that the unreasonable behavior harmed Plaintiffs." *Robinson v. City of S.D.*, 954 F. Supp. 2d 1010, 1027 (S.D. Cal. 2013) (citation omitted). "'Reasonableness' under the Fourth Amendment and 'reasonable care' under a negligence theory are synonymous insofar as they consider the same conduct." *Smith v. Cty. of Butte*, No. 215CV00988KJMCMK, 2017 WL 1540315, at *16 (E.D. Cal. Apr. 28, 2017) (citing *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 513–17 (2009); *Atkinson v. Cty. of Tulare*, 790 F. Supp. 2d 1188, 1211 (E.D. Cal. 2011) (negligence and battery "measured by the same reasonableness standard of the Fourth Amendment") (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272–73 (1998))). Therefore, the Court's conclusion that there are material disputes of fact as to the reasonableness of Deputy Woodworth's conduct for the purposes of Plaintiff's Fourth Amendment excessive force claim also applies to his negligence claim, making summary judgment on that claim inappropriate.

### G.    Bane Act Claim

The Bane Act " 'provides a cause of action for violations of a plaintiff's state or federal civil rights committed by "threats, intimidation, or coercion." ' " *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1)). In *Cornell v. City and County of San Francisco*, the California Court of Appeal "recognized that Bane Act claims are routinely alleged in Section 1983 claims under federal pendent jurisdiction and that '[t]he Bane Act's requirement that

United States District Court
Northern District of California

interference with rights must be accomplished by threats[,] intimidation or coercion "has been the source of much debate and confusion." ' " *Id.* (quoting 17 Cal. App.5th 766, 801(2017) (citations omitted)). The *Cornell* court provided guidance on this question, which the Ninth Circuit has found is binding on federal courts. *Id.* at 1043. In *Reese*, the court drew two conclusions as to the necessary showing for an excessive force claim under the Bane Act:

> First, the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be transactionally independent from the constitutional violation alleged. *Cornell,* 225 Cal.Rptr.3d at 382–83. Second, the Bane Act requires a "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* at 384.

*Id.* at 1043. Thus, to prevail on a Bane Act claim, a plaintiff must establish "that the defendants intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (internal quotations and citations omitted).

Here, Defendants contend Deputy Woodworth's body camera footage establishes, as a matter of law, that his conduct was reasonable and therefore, that there can be no genuine dispute of material fact that he had the specific intent required to establish a violation of the Bane Act. For the reasons discussed above, however, the Court finds that the reasonableness of Deputy Woodworth's conduct, and by extension, whether he had the specific intent required for a Bane Act claim, are questions that must be decided by a jury.

## H. Punitive Damages

Under California law, punitive damages require a showing by clear and convincing evidence that a defendant acted with oppression, fraud, or malice. Cal. Civ. Code § 3294(a). Defendants contend this standard cannot be met because the evidence establishes as a matter of law that Deputy Woodworth acted reasonably. For the reasons discussed above, the Court finds that there are fact questions as to the reasonableness of Deputy Woodworth's use of force. Therefore, the Court declines to enter summary judgment as to Plaintiff's claim for punitive damages as to Deputy Woodworth. However, under California Government Code section 818, "a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant." Therefore, summary judgment is granted as to Plaintiff's request for punitive damages against the

United States District Court
Northern District of California

1   County of Sonoma.

2   **IV.   CONCLUSION**

3       For the reasons set forth above, the Motion is GRANTED with respect to Plaintiff's claims

4   under 42 U.S.C. § 1983 against Deputy Woodworth and the County of Sonoma (Claims One and

5   Two) and as to Claim Three (the false arrest claim), which are dismissed with prejudice.  The

6   Motion is DENIED as to Plaintiff's remaining state law claims (Claims Four through Seven)

7   except to the extent Plaintiff seeks to recover punitive damages against the County of Sonoma on

8   these claims.  As to the remaining state law claims, the Court declines to exercise supplemental

9   jurisdiction and therefore dismisses Claims Four through Seven without prejudice to refiling them

10  in state court.  *See* 28 U.S.C. § 1367 (district court has discretion to decline to exercise

11  supplemental jurisdiction over a claim if it has dismissed all claims over which it has original

12  jurisdiction); *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988), superseded on

13  other grounds by statute as recognized in *Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 557 (10th

14  Cir. 2000) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the

15  balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

16  convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the

17  remaining state-law claims."). The Clerk is instructed to enter judgment in favor of Defendants on

18  Plaintiff's federal claims only (Claims One and Two) and close the file.

19      **IT IS SO ORDERED.**

20

21  Dated:  November 18, 2021

22

23  JOSEPH C. SPERO
    Chief Magistrate Judge

24

25

26

27

28